Yes, Your Honor. Okay, we're ready to start. I'm ready to start. Good morning, Your Honor. Good morning, Your Honors. The District Court below erred in resolving factual issues, excuse me, a claim construction issue at the Rule 12b6 stage, which under this Court's precedent in cases like Atrix, Cellspin, National Alternatives, requires reversal and remand for further proceedings. The case comes to the Court on a very, what I would consider, highly unique posture. Most of the cases that this Court takes in from the District Court level are claims that were from the late 90s throughout the 2000s that were examined and allowed prior to the Alice Doctrine. In this case, the rejection by the examiner below under 101 came at the end of 2016, and the claim amendments were expressly considered by the examiner here. The issues before this Court are issues that the examiner expressly considered and found the specificity of the amendments got us around 101. In Cellspin, this Court itself said that at the 101 determination phase, patents are presumed valid. We have an original complaint at paragraph 13 that talks about the unconventionality of this method. We have 35 amended paragraphs, or excuse me, 35 paragraphs in the amended complaint that talk in great detail about what I think most of us know. We all know what the prior process for real estate showing was, but we describe it in detail. We talk about the new method in Claim 7, which is, even the District Court several times admits it's a different method, but then goes on to just find it conventional with no citation to evidence. So there is a substantial record that this patent was not conventional and is far different from the technology that predated it. It's quite frankly perplexing how a District Court judge on this record could not send this case on to further proceedings, including claim construction. Let's start from the premise that the Court concluded that this claim is about texting a customer a key code so the customer can let themselves into a house on sale, so a property manager doesn't have to go out there and open the front door for the customer. So it's just about sending information to someone so that they can enter a premises. I think that's an oversimplification of the claim. I know that's your position, but I guess let's talk specifics now. What is the problem with that? So the method overall, and again, as was cautioned in Alice and this Court said it too, it's easy to boil any patent down to some basic principle, but here the conventional method for conducting real estate was the realtor and I, we have to work out a time, we go meet, and the realtor has a code, he enters a static code into a lockbox, and we look at the property together. No one ever thought that the technology for doing what the claim now covers has been around. Somebody could have done this a long time ago. Well, here's a hypothetical. What if the claim said, oh, I'm your real estate agent, but I'm not going to be able to come to the house with you, so I'm going to text you the key code and you can get in yourself and take a look around. Would that be patent eligible? No, it would not in my view, but it's a static code. That's simply the same, that's the same traditional method except the, and it wouldn't be infringing either, by the way, because it's a static code, so it would not infringe our claims. If that's considered auto entry, that would be another method for not infringing the patent, but I would not think that merely a realtor faxing or texting a static code just because the realtor couldn't show up would be patentable. I would agree if that's the point of your question, that that's not patentable, but our client thought, and that would be addressing a particular circumstance where a realtor maybe got delayed for some reason, traffic, for example. I don't even know if their code of conduct would allow it, by the way. I would imagine as a realtor sending... What if there was another claim limitation that said, and then the realtor goes and reprograms the lock at the end of the day? Again, I wouldn't think that that would be patentable, but that hasn't been before. I mean, somebody could file a patent on that. What if there was another limitation that said, and then a magic server remotely reprograms the lock? If you start to get into technology that would allow someone to send a code and then you're going to reprogram it, that might be patentable. You're getting into specific territory. I mean, the test is, what was conventional? You know, what was the conventional method? We have a new method, and it's by the Patent Office been deemed... You seem to be skipping right to step two and not focusing on the abstract idea this patent is directed to, and then discussing what beyond that abstract idea is unconventional. You just want to look at it all and say, well, nobody thought about doing it this way before, but don't we have to, under Alice Step 1 first, decide what the abstract idea is and then decide whether there's any nonconventional elements added to that abstract idea, not whether the abstract idea itself is nonconventional. That is correct, Your Honor, and there's... If you look at a case like Enfish, we put the specificity in Step 1 and we don't reach Step 2. In this case, the district court judge found that the abstract concept is automated entry. I don't have a problem with that finding in Step 1, and I would agree that that would be an abstract idea and proceed to Step 2. So you concede Step 1? I would be willing to concede Step 1, but the specificity of the claim can't be ignored. So whether, as in an Enfish analysis, we put that specificity... After you assume that this type of automated entry is an abstract idea, what's nonconventional? You didn't invent smart locks or lockboxes. You didn't invent the idea of sending people text. I don't see anything in here that's not using conventional equipment or conventional technology. There is no conventional lockbox which understands and opens in response to durational codes. There's no evidence of that. At this stage, our Rule 12.6 motion, where we've alleged that that is unconventional, never done before, that's enough. So are you claiming an apparatus? You invented the lockbox? The apparatus is part of the ordered combination, yes. It's specifically called for in Claim 7. In combination with technology that's going to generate a durational code, provide it to the user, and then the user goes to the site and works with a lockbox that's never existed before. But you would agree that the lockbox already, that's conventional? A conventional lockbox that receives static codes. The lockbox of our patent is not conventional, and if there's going to be a disagreement about that, that's something that should have been the subject of claim construction. I'm just trying to help you out. I appreciate that. So you're dealing with technology, right, that operates the box. This is a technology-enabled box. It's absolutely technology-enabled. It has to be. It's undisputed that a traditional lockbox can't receive a durational code. If you invented a smart lockbox, why aren't we talking about that patent claim versus this method claim? If you're saying that what's unconventional is this smart lockbox, then where's the claim on that? I mean, that's a piece of equipment that seems to be completely divorced from an abstract idea. Did you actually invent a smart lockbox? Is that what this patent's about? Well, we certainly did invent the smart lockbox by our view. Our biggest— But in fact, this flows in the specification. I mean, this is a pretty thin specification. Column 8 talks about the fact that the lockbox has to be programmed to receive durational codes. If you also look at Figure 12— Can you point it out to me? Yes, Your Honor. And we have—in our reply brief, I'm going to answer the question directly, but in our reply brief, we have a whole section on the spec that discusses the lockbox and its ability to receive durational codes. But Column 8— What's the page that you're looking at? In the appendix, I am at— A61. A61. And it's lines 5 through, like, 12. In Block 183, shown in Figure 10, the server 11 communicates with lockbox to allow the visitor to enter during the specified time period and before the time of expiration. And that talks about the code. If you look at Figure 12 of the patent— If you look at Figure 12, Box 95, it talks about the code expires in one hour. Can you give me a question, please? So, I mean, I'm lost. I mean, I really don't understand at the moment what are the contents of this technology-enabled lockbox. I think at one point in one of your briefs, in Blue Brief 24, you say that your special lockbox either already contains the list of time-specified codes or otherwise can be pre-configured and synchronized with the software providing the automated entry information to facilitate self-showing. It can be performed either way. So, I guess the concern I have is that this is starting to feel post hoc, that you're now imagining different kinds of embodiments of what this black box lockbox is doing when, you know, the claim is really directed to a problem. And the problem is how do we let customers in by themselves without requiring a property manager to let them in? And then, oh, we don't want them to be able to get into the house permanently, so let's make sure that the key code is a temporary key code. But then there is no explanation further on what is the lockbox and what is inside the lockbox. And I don't know if the lockbox is what you're saying here at page 24 of your brief. I mean, that's not what your spec says. I mean, I don't know if the lockbox is simply something that communicates with some remote server and the remote server then tells the lockbox, yes, that code that just got punched in is a good code, so go ahead and open the door. I mean, and so it's more of a dummy lockbox than anything else. But the problem here is that the patent, the claims are directed to something else and the fact that there's a lockbox reference, there's nothing in the claim nor the specification that tells me that this lockbox is the heart of the invention that is some kind of specialized dynamic lockbox. And that's the concern I have. Well, that's a fair question, of course. The answer to it, and it comes back to the question that you asked, Judge Hughes, which is this is an overall, our client's business is the overall method. The overall method which deviates from a conventional practice that's known, as pled in our complaint, was renter and realtor go together at a coordinated time and the realtor enters the code. The paradigm shift here, and it is a paradigm shift, is that the method is now a computer generates a durational code which is given to the user after there's an authentication process. The user can then go to the lockbox and enter the code. I don't think the lockbox, once you know the idea, the lockbox is not going to be something that's difficult to create. However, there's coordination between the server and the lockbox, and it could be the claim doesn't require whether it would have to be a communication link or whether it could have just been pre-programmed. You could do it either way. When you talk about that coordination, it reminds me of SIPCO versus Emerson. Are you familiar with that case? I am familiar with that case, Your Honor. Is this case like that, like SIPCO? I don't think, in a sense, I mean, it is in the sense that, again, we have an unconventional method here. I mean, there's no question that we know the prior method. We have changed the method. All that Alice requires is we have specific steps that define our method. The district court judge says that it covers all of automated entry, but it doesn't cover all of that automated entry because I could have an app that I show up at the property and I hit on here, and the realtor communicates and hits open door. I still don't know what's inside the lockbox. It's software. I mean, that's the problem with software. I know, but how does it actually operate? Well, it's going to receive a signal, a code. In response to that code, it's going to probably look at a lookup table. Okay, probably look at a lookup table. Where's the lookup table? In the lockbox? Yes, but that's an enablement issue. That's a Section 112 issue, not 101. Well, what I don't understand is what is your invention, and now I'm scared that you're asking us to infer an inventive concept. I'm not. It's a method claim which says that you receive this durational code. Then you go to the property where there's a lockbox. You put in a durational code. It used to be a static code, so lockboxes understanding a code is not a big deal, but you put in the durational code instead of a static code, and it lets you in for a predetermined period of time. All right, you're into your rebuttal time. I realize I'm well into it, so thank you. I'm not restoring time. We took your time, so. Thank you, Your Honor. Yes. May it please the Court. My name is Lauren Mills, and I represent Tenant Turner. The issue here is patentability, not novelty. You have to jump over 101 before you ever get to 102 or 112, and they have failed to jump over 101. They conceded 101 today. I think they conceded step one. Step one of the house. Step one of the house. This is clearly a method of organizing human activity. It's implemented on entirely generic devices. What about your friend's argument that actually the lockbox here is completely unconventional? Well, one, unconventional is a novelty issue, not a patentability issue. Well, but it's step two. It's also part of the step two analysis. I don't think that they claim an apparatus. This is a method claim, and if they're going to claim an apparatus, they better claim some structure, and the only structure in this, we called it in our brief a black box. It's actually in the patent a white box, but that is the only structure shown for it, and the way it works is not smartness at the lockbox level. It's smartness back at the server level because it seems to be communicating back and forth with a server at some level, so it's different than what was described here by my friend was actually disclosed in the patent. And so the court got this right. It's shocking that the patent was granted after Alice. The examiner instantly recognized the abstract nature of it but bought the argument that by actually eliminating part of the automated process and sending the person a text message that they didn't have to manually punch in, that somehow made it patentable under Alice. So much for a technology-enabled lockbox if it takes the manual step to make this patentable. So it kind of eliminates the middleman here. That's what it does. That's what all of these method patents do that have been struck down under Alice. Are you familiar with the case that goes? I'm not. I think that this case is actually like this court's decision in Chargepoint almost a year ago, and it's a case that Judge Dumas focused on when it was at the district court level in front of Judge Gargis. And that had to do with a network for basically charging Teslas or other electric cars. And the analogy is exactly the same. It was an interesting method, coordinated by software, implemented on purely generic devices. And there's another case that this is like that way predates Alice, which is Wyeth v. Stone in 1840. It was a method of ice cutting. And if you look at the patent on that, it's actually a fascinating read. They actually disclose in the specifications lots of really detailed methods of ice cutting, but the claims were at such a broad level, the court said, the famous justice story said, no way, you cannot claim at that level of abstraction and 101 didn't exist, but in the precursor, you cannot claim a patent at that level of abstraction. And that's exactly what's going on here. They're trying to preempt the entire field. And it's claimed at too broad a level to be patentable. They don't get over section 101. I believe you understand the rest of my argument, unless you have any further questions. Thank you. Yes, it would be affirmed. Thank you. I'm going to restore your time to 30 minutes. Thank you, Your Honor. I don't know if we'll need it all or not, but I do want to make sure that I answer the questions before the court. I mean, this is really important. I mean, it's our client invested in the patent system, had an examiner look at this patent and agreed it was past 102, past 103, past 112, and past 101, and specifically required us to add limitations so it was a specific method. They entered the market, and nobody even believed the method was viable. And that's all in the record. And then ultimately, after three or four years, we proved the method's viable, and now people want to use it. Under Alice, the question is, is our method specific enough? And Judge Chen, I also want to add that more support in the record for the lockbox is at column two, lines 51 to 60, talking about the code and how it has to receive the code. But this is a real invention. I mean, we have an examiner that has looked at this. We've pled 35 paragraphs of complaint that talk about the conventional method, the new method, how it's different. There's no evidence of a lockbox that's ever existed like this before in combination with an overall rental method. And, Your Honor, we could have a lockbox patent claim, but what our client's mostly concerned about is competition from people like Zillow that are now starting to use this. And so they are worried about the overall process and running a business based on this and all of the benefits that it produces. All that Alice forbids is that you can't have a patent directed to the idea itself. The idea itself found in step one is automated entry. In step two, you would have to add in the technology that has durational codes. You have to add in a method step that involves not the realtor putting in the code, which is the traditional method, but now the user putting in the code, and it's a durational code in connection with a lockbox that recognizes durational codes that's never existed before. There's this discussion about the devices are generic. EnFish is software running on a generic computer that created a self-referential table. MCRO is animation software with phenom rules running on a generic computer. The law is not that because you use generic components that it's unpatentable. The question is do we have a new useful and non-obvious method that complies with Section 112 and has the specificity required by 101 to not be a patent to the idea itself. This claim meets it. The Patent Office has looked at it specifically and said that our additions meet 101. And at the Rule 12 stage, that should be enough for us to be able to move on with the case to determine, let them prove that lockboxes that receive durational codes in combination with the rest is conventional. Let them prove that the conventional method encompasses this, but at this point the case should move forward. So I appreciate your time. If the court doesn't have any further questions, I'll rest. Okay, we thank you for that. Thank you. We thank all the parties today for their arguments. This court now remains in recess. All rise.